F1DSGRAS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          14 CR 130 (RPP)

5   ROBERTO GRANT,

6              Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         January 13, 2015
9                                        2:45 p.m.

10

    Before:
11
                    HON. ROBERT P. PATTERSON, JR.,
12
                                         District Judge
13

14                       APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    RICHARD COOPER
17      Assistant United States Attorney

18  JESSE M. SIEGEL
        Attorney for Defendant
19

20

21

22

23

24

25

F1DSGRAS

1              (Case called)

2              THE COURT:  Good afternoon.  Is Mr. Grant here?

3              THE DEFENDANT:  Yes.

4              THE COURT:  There he is.  I'm sorry. my eyesight is

5      getting a little poor.

6              Good to see you, Mr. Grant.

7              THE DEFENDANT:  Thank you.

8              THE COURT:  Does the defendant need an interpreter,

9      Mr. Siegel?

10             MR. SIEGEL:  He does not, Judge.

11             THE COURT:  This matter is on for sentence.  I have

12     before me a sentencing submission by Mr. Cooper dated

13     January 13, a November 13 presentence report by Stephanie

14     Dunne, and also a March 22 sentencing memorandum in the matter

15     of United States v. Roberto Grant.  Accompanying that letter

16     from Mr. Siegel are letters from Shayla Simpson dated

17     September 10, 2014, Fredericka Evans dated September 23, 2014,

18     and Nicole Morrison-Grant dated October 1, 2014, who is

19     Mr. Roberto Grant's previous wife and current fiancée.  Do I

20     have any other documents before me?

21             MR. COOPER:  No, your Honor.

22             MR. SIEGEL:  No, Judge, that is it.

23             THE COURT:  Then I will hear from you on the sentence,

24     Mr. Siegel.

25             MR. SIEGEL:  Thank you, Judge.

F1DSGRAS

1           Before I get started, I would like to introduce you to

2    Mr. Grant's family who are here in court.  His wife and his two

3    children and two stepchildren are here.  His mother is here.

4    His two uncles and his sister with Mr. Grant's nephew and his

5    brother and a niece showed up as well before.  I just wanted to

6    bring that to your attention.  Those are some of the people who

7    wrote the letters to you and who were mentioned in the

8    presentence report.

9           Judge, obviously this is a serious case.  There is no

10   way around it.  I can't dispute that.  There are certain things

11   about it that are obvious, and one of them is that it is a

12   serious case.  Another is that Mr. Grant has a bad record.  I

13   guess another obvious point is that he has previously been

14   sentenced to several sentences, including most recently a

15   10-year sentence.

16           THE COURT:  In state court.

17           MR. SIEGEL:  In state court, that's correct.  I will

18   address that in a moment.

19           THE COURT:  Involving the same transactions?

20           MR. SIEGEL:  Not the same transactions, no, but the

21   same type of crime, robberies.

22           I know there is something of a logic that each time

23   you commit an offense, you have to get more than you got the

24   last time.  But I would like to address that in a moment, if

25   that is okay.

F1DSGRAS

1          It is a serious case, but we are requesting a serious

2     sentence.  We are not asking for a mere slap on the wrist.  We

3     are requesting that the court impose a 10-year sentence.

4     Mr. Grant is right now 34 years old with a 10-year sentence.

5     He would be in his early 40s, about 42 or 43 --

6          THE COURT:  It's a mandatory sentence?

7          MR. SIEGEL:  It is not a mandatory sentence.

8          THE COURT:  10 years isn't?

9          MR. SIEGEL:  He faces no mandatory minimum.  The court

10     could go lower, and if the court thinks that is appropriate, we

11     of course would be very happy with a lower sentence than

12     10 years.

13          This is a case where his guidelines are determined by

14     the fact that he is a career offender, and his guidelines are

15     151 to 188.  Probation has recommended a sentence at the bottom

16     of that range, 151 months.  The government has simply

17     recommended a sentence within the recommended range.

18          But in any event, we are not asking that the court not

19     deal with this as if it is not a serious case.  Obviously we

20     are acknowledging that a serious sentence is appropriate.  We

21     are just asking the judge to temper the justice of the

22     situation with perhaps a little mercy.

23          It is a serious case, there is no way around that.

24     These are a number of robberies involving quite a bit of -- the

25     value was quite high.  There is no question about that.

F1DSGRAS

1          THE COURT:  What went wrong here?

2          MR. SIEGEL:  What went wrong in terms of Mr. Grant

3     becoming involved in this?

4          THE COURT:  You look at his record, and it starts at

5     about the age of 15, and that doesn't add to his sentence, but

6     then he has another arrest, another arrest, and I would think

7     one after another before he is even 18.  Then after he is 18, a

8     whole series of arrests.  I didn't work it out with pencil and

9     paper, but he spent more time in jail than he did outside of

10    jail.

11         MR. SIEGEL:  I think that is very nearly true.  And

12    certainly, even if the court was to impose the sentence of

13    10 years, by the end of that, he will have spent well more than

14    half his life in prison.

15         I think you have to, if you really want to figure out

16    what went wrong in Mr. Grant's life, you have to go back to

17    before he started getting arrested.  Mr. Grant was not even in

18    the United States when the United States invaded Panama, which

19    is where he lived with his father and stepmother and his step

20    siblings.  And during the invasion, they killed his father.

21         Again, this is not put forward as an excuse, although

22    in re-reading what I prepared, I continue to be struck by this

23    sort of tragedy of the situation, because Mr. Grant at the time

24    happened to be visiting his mother in Brooklyn --

25         THE COURT:  Is he a citizen of the canal zone or a

F1DSGRAS

1    citizen of the country of Panama?

2            MR. SIEGEL:  He was a citizen of the country of

3    Panama.  His father was a military officer, and as a result of

4    that -- and he lived a comfortable middle-class existence and

5    was getting a good education, and that is really where things

6    started going south for Mr. Grant.

7            He didn't return to Panama.  Again, not that this is

8    an excuse, but looking at it, as I suggested in my sentencing

9    memorandum, he is a smart young man, still a young man.  He is

10   personable.  He speaks well.  He might have very well followed

11   in his father's footsteps, and today, he might be a career

12   military officer in Panama but for that invasion.  Not that

13   that serves as an excuse, but it is where his life started

14   going south.  So he is up in Brooklyn, and quickly he succumbs

15   to the temptations and the bad influences of his surroundings.

16   Again, had that not happened, he might never have been in

17   Brooklyn, other than for the occasional visit.

18           And you have to wonder how the whole situation

19   affected him psychologically.  Perhaps he is acting out some

20   sort of anger in an anti-social way.  I don't know that any of

21   us are sort of qualified to really get into that, but it is a

22   tragic situation.

23           THE COURT:  How old was he when his father got killed?

24           MR. SIEGEL:  I think he was nine or 10.

25           THE DEFENDANT:  Nine.

F1DSGRAS

1         MR. SIEGEL:  He was nine years old.  By his mid teens,

2    he is living in Brooklyn.  He is getting into trouble.  By the

3    time he is 18, he sustains his first several robbery

4    convictions, but he gets out after a fairly substantial bid of

5    close to four years.  And within that same year, he commits

6    another robbery.  He is arrested again and he gets a 10-year

7    sentence.  By the time he hits 32, 33, he has spent,

8    unfortunately, a very large chunk of his life in prison.

9         Now he is looking at another large period.  And I

10   can't accuse the government of being unreasonable when they

11   say, well, if 10 years didn't deter him last time, why will

12   10 years deter him now.  First of all, I think there is some

13   changed circumstances in his life that could give the court

14   hope that now a sentence of around that duration would have

15   more of a deterrent effect, namely the fact that he now has two

16   children, who are present here in the courtroom making -- his

17   kids are the quiet ones, but...

18        You know, they are about a little over a year old.

19   And realizes he is not going to see them for a very long time,

20   but he does want to play a part in their life.  As his wife's

21   letter made very clear, he is a devoted father.  And as some of

22   the other letters made clear, he is not only with his own kids,

23   but he has helped out with kids in need, and he really does

24   have that part of his personality also, the noncriminal part of

25   Roberto Grant.  Under these circumstances, he will be in his

F1DSGRAS

1    40s when he gets out.  He could be.  Hopefully a 10-year

2    sentence this time or something in that range will have more of

3    a deterrent effect on him.

4          When he got out of jail, he did work, but he lost that

5    job, and he unfortunately reverted to following in a pattern

6    that had been established in his life at a very early age.

7    That is a difficult thing to overcome.  It is a difficult thing

8    to ignore, of course, but I think it is just a fallacy in

9    thinking that the sentence has to go up every single time.

10         I mean, there is a certain logic to it, but on the

11   other hand, you could look at that and say, well, that is what

12   happened last time and it didn't work, so what is the point of

13   doing the exact same thing again?  I think what I am suggesting

14   is that maybe this time -- there is no way around giving him

15   are very substantial sentence -- but maybe this time would have

16   more of an effect on him if he saw that that sentence was

17   tempered perhaps with a little mercy.  Again, we are not asking

18   for a lot of mercy.  We are asking for a little mercy.  Maybe

19   that will have an effect on him.

20         THE COURT:  How far did he go in school?

21         MR. SIEGEL:  What grade did you drop out of?

22         THE DEFENDANT:  I made it all the way to the twelfth

23   and got arrested.

24         MR. SIEGEL:  He got arrested in the twelfth grade.

25   That was the end of his formal education, but he has gotten his

1    GED.  I think you will hear, when you hear him speak, that he

2    is an obviously intelligent man and he is well spoken.  If he

3    could stick with doing something legitimate, he has the

4    abilities to be successful at that.

5            THE COURT:  Has he taken any courses during his prison

6    terms?

7            MR. SIEGEL:  I am aware that the one course he took

8    was they have a drug program over at MCC.  Unfortunately he is

9    at MCC, and the reality is, there is not much offered there.

10   He has not --

11           THE COURT:  It is time to do something about that.

12           MR. SIEGEL:  Hopefully, he will.  He will have time in

13   prison to get the benefit of whatever is available.

14           THE COURT:  I am more interested in whether he has

15   taken any cognitive behavior training, anything of that sort.

16           MR. SIEGEL:  I don't think he has had the opportunity

17   yet, Judge.  I know that while he was doing his last state

18   court bid, he did take their drug treatment program, which was

19   mandatory, but that is actually not his issue.  He doesn't have

20   a very substantial drug problem.  That is not indicated in the

21   presentence report.

22           THE COURT:  They started one at the MCC.  This session

23   they are offering it.

24           MR. SIEGEL:  Is that right?

25           THE COURT:  Yes.

F1DSGRAS

1          MR. SIEGEL:  Judge, once again, I guess there is a

2    couple of other small points I could make.  These are serious

3    crimes, no doubt, but Mr. Grant is not accused of having

4    himself committed any violence during them.  I am sure they

5    were extremely scary experiences for the store owners and

6    workers who were there, but in some way, the scariness is what

7    substituted for actual violence in only one of the robberies

8    that he is charged in where a codefendant used a stun gun on

9    someone.  The other actual violence, rather than threaten

10   violence referred to by the government, was when one of the

11   store employees shot at them, rather than the other way around.

12         There is no question, look, these are serious crimes,

13   but --

14         THE COURT:  I thought a woman employee had gotten

15   injured?

16         MR. SIEGEL:  I think what the government has said --

17   and I don't really know the extent of her injuries -- is that

18   she had had a stun gun used on her.

19         But, again, these incidents, aside from that one, were

20   more scary and potentially dangerous than actual people getting

21   actually hurt.  I understand it is a small point, but it is a

22   point that Mr. Grant himself did not engage in any violence

23   during these robberies.

24         The other small point I could make is that he appears

25   here as a career offender, but he appears as a career offender

F1DSGRAS

1   by virtue of crimes he committed when he was 18 years old and

2   23 years old.  Now it is true he is here because of crimes he

3   committed when he was 32 years old, but he is here facing such

4   a very high sentencing range as the result of convictions

5   sustained when he was a young man, a very, very young man.

6            Judge, for all these reasons, I am asking your Honor

7   to show whatever mercy that you're able to under these

8   circumstances, and I think the very act of showing that mercy

9   in these circumstances could lead to a result that has not

10  resulted from him being treated as harshly as he has in the

11  past.

12            Thank you.

13            THE COURT:  Mr. Cooper.

14            MR. COOPER:  Your Honor, I will just make a few

15  points.  I won't repeat what we have in the submission, which

16  the government has read.

17            In terms of defense counsel's comments about these

18  robberies and dangerousness, I just want to be clear that these

19  were violent robberies.  This was a robbery crew, including

20  this defendant, that targeted crowded stores, not at night when

21  the stores were closed, not at times when there might be a few

22  customers present, but in the middle of the day when there are

23  employees and customers in the stores.  They carried concealed

24  weapons, your Honor.  The weapons that they brought in to all

25  the robberies were sledgehammers that they carried into the

F1DSGRAS

1    stores, they took out, and they smashed glass display cases.

2             Now, in one of the robberies, as defense counsel noted

3    and as is pointed out in our sentencing submission, one of

4    Mr. Grant's codefendants brought a stun gun and used that stun

5    gun to knock out a female employee, store employee, cold; knock

6    her to the ground.  She wasn't resisting, your Honor, and the

7    stun gun was employed on her.

8             It is correct, as defense counsel notes, that

9    Mr. Grant, we do not believe, was the one who used the stun

10   gun, but he was there for the robbery.  He assisted in planning

11   that robbery, he assisted in carrying out that robbery, and

12   that was the robbery where a stun gun was used.

13            These robberies carried with them, your Honor, all of

14   them, the inherent danger that something would go very wrong.

15   As is shown in the robbery that occurred in Cranford, New

16   Jersey.  Another one, we point out in our submission, where one

17   of the store employees had a gun and used that to fire at the

18   robbers.

19            So the robberies carried with them not only the risk

20   that the robbers would reek violence on customers or employees,

21   but also, Judge, that a security guard or an employee would

22   resist the robbery and somebody would get injured.  That very

23   nearly happened in Cranford, New Jersey.  Mr. Grant in

24   particular should have known of that risk, because in his last

25   conviction, prior to this case, in 2004, as is pointed out in

F1DSGRAS

1    the presentence report, Mr. Grant and his codefendants disarmed

2    a store security guard, took his weapon from him, and fled with

3    that weapon.  These are very dangerous robberies.

4          The only other points that I will make, in addition to

5    what is in our sentencing submission, is on this issue of

6    Mr. Grant's priors.  He has four prior robbery convictions.  He

7    got four terms of imprisonment, your Honor, of increasing time.

8    Each time he was paroled from his convictions, and each time

9    his parole was revoked because he committed more robberies.

10   There is no reason to think that just doing the same thing and

11   giving him a 10-year sentence is going to have any different

12   result, because what happened after the last 10-year sentence,

13   your Honor, it was imposed in 2004, he was paroled in 2012 in

14   September, and in July of 2013, not a year after that, he

15   started committing the robberies that are part of this offense.

16         In terms of defense counsel's argument about changed

17   circumstances and having children, we recognize that that is

18   something that the court should consider.  But it also bears

19   noting, your Honor, that the defendant chose to participate in

20   these robberies and in this robbery conspiracy that is part of

21   this case after those changed circumstances went into effect,

22   after he had children.  He is the one who chose to commit the

23   crimes and he is the one who understood the risks of doing so

24   at a time when he had a family.

25         We believe that there is no reason to think that doing

F1DSGRAS

1    the same thing that was done before, handing down a

2    non-guideline sentence, would have any deterrent effect, and

3    those are the reasons, Judge, why we have asked the court to

4    impose a guideline sentence here.

5            Unless the court has any questions, that is all we

6    have.

7            THE COURT:  There is some statistical evidence that

8    when you reach a certain age, that they're less apt to commit

9    violent crimes.  How does that fit into the equation on how you

10   should sentence a man who is in his early 30s?

11           MR. COOPER:  Your Honor, I'm sorry --

12           THE COURT:  There is no mandatory minimum.  There is

13   less guidance, and the original guidelines offered, which are

14   pretty finite.  Now, with Booker, I find an awful lot of

15   sentencing submissions refer to the age of the defendant.  And

16   if they're in their 30s, it is more on the edge than if they're

17   their 20s or in their 50s.  How do you read it?  I may be

18   reading it wrong.

19           MR. COOPER:  What we have to go on, your Honor, is the

20   circumstances of this defendant.  Based on the presentence

21   report, Judge, it appears that there have been different eras

22   of the defendant's life when he committed crimes and then was

23   caught and was sentenced, got out, and reoffended.  I don't

24   know how general statistics on recidivism may apply to this

25   defendant.  What we do know is that he has committed robberies

F1DSGRAS

1    in the past, that he has been punished for committing these

2    robberies, and that just hasn't worked, your Honor.

3              THE COURT:  That is true.

4              MR. COOPER:  When he got out this last time, he was in

5    his early 30s.  I don't know what the statistics say about

6    individuals released from incarceration in their early 30s,

7    where they are on the recidivism scale.  What we do know is, at

8    that point in time, Mr. Grant had a choice, and he chose to

9    engage in this robbery conspiracy and these violent robberies.

10   For that reason, we believe that a guideline sentence is

11   appropriate.

12             Thank you, your Honor.

13             THE COURT:  Thank you.

14             MR. SIEGEL:  Judge, Mr. Grant wanted to address the

15   court.

16             THE COURT:  I was going to ask him to.

17             MR. SIEGEL:  Thank you.

18             THE COURT:  If you have nothing to respond, I think we

19   should hear from Roberto Grant.

20             Would you like to say something?

21             THE DEFENDANT:  Yes, I do.

22             THE COURT:  Your circumstances and these things, how

23   do you feel I should deal with these things?

24             THE DEFENDANT:  Can you repeat yourself?  I didn't

25   hear you.

F1DSGRAS

1          THE DEPUTY CLERK:  I don't think he heard you, Judge.

2          THE COURT:  I would like to hear from you as to what

3    the pressures are that you feel as a convicted robber and why

4    you think that, at the age of 34, you have had it with this

5    routine of, I have to say, of committing robberies on about a

6    monthly basis?

7          THE DEFENDANT:  Your Honor, it wasn't -- it was just,

8    I tried.  I tried to change.  Working, family, society just --

9    I have to tell you everything.  Society --

10          THE COURT:  Yes?

11          THE DEFENDANT:  I lost my job.  I had to support my

12    family.  I went about it the wrong way.  I take full

13    responsibility for my actions.  I just want a chance, another

14    chance, to prove that this is not my life anymore.

15          THE COURT:  You lost your job over what?

16          THE DEFENDANT:  It was cutting back.  The job cut

17    back.

18          THE COURT:  I'm sorry?

19          THE DEPUTY CLERK:  The job cut back.

20          THE COURT:  I can't hear you.

21          THE DEFENDANT:  Job cutbacks.

22          THE COURT:  What kind of a job did you have?

23          THE DEFENDANT:  I was working in the Quality Cleaners

24    cleaning office buildings in Maryland.

25          THE COURT:  Was it because you were the newest

F1DSGRAS

1   employee, or was it because of other factors?

2             THE DEFENDANT:  No, they didn't say because I was a

3   new employee.  They cut a bunch of us last guys who got hired.

4             THE COURT:  Where were you working?

5             THE DEFENDANT:  In Maryland, Silver Springs, Maryland.

6             THE COURT:  Maryland?  Silver Springs outside of

7   Washington?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Why would you be down there?  Where was

10  your family living?

11            THE DEFENDANT:  That's where I live at.

12            THE COURT:  Is that where they live?

13            THE DEFENDANT:  Yes.  I moved.  When I was released

14  from prison in 2012, I moved to Maryland with my family.  I

15  needed a new start.  I got a new start.

16            THE COURT:  Why did you pick Silver Springs?

17            THE DEFENDANT:  That is where my family moved to.

18            THE COURT:  Is there a reason?

19            THE DEFENDANT:  Huh?

20            THE COURT:  Is there a reason why they went to Silver

21  Springs?

22            THE DEFENDANT:  My family moved down to Silver

23  Springs, Maryland.  So my wife, my sister, my kids.

24            THE COURT:  Why was it that they wanted to live down

25  there?

F1DSGRAS

1          THE DEFENDANT:  New start.

2          THE COURT:  New start?  So it was really for you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  When was the time before that that you --

5     how long before that, that you committed --

6          THE DEFENDANT:  2004.

7          THE COURT:  That is the one you were convicted of?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Weren't you involved in other robberies

10    between the date of the Silver Springs and these robberies?  I

11    mean, these robberies that you're charged with took place in a

12    number of different localities.

13         THE DEFENDANT:  Yes.

14         THE COURT:  Why did you get involved in those?

15         THE DEFENDANT:  Wrong friends.

16         THE COURT:  Silver Springs.  I am not saying your

17    family was involved, but what about these places where you

18    didn't have family?

19         THE DEFENDANT:  Hanging with the wrong crowd.

20         THE COURT:  Over what length of time did you commit

21    these robberies?

22         THE DEFENDANT:  Well, it states that it happened from

23    July until January.

24         THE COURT:  Six months?

25         THE DEFENDANT:  Yes.  I can't sit here and explain why

F1DSGRAS

1    I am being charged with all this, because I don't know.

2              THE COURT:  You don't know?  You must have had some

3    participation in this.

4              THE DEFENDANT:  I take full responsibility for my

5    participation in it.  I am taking full responsibility for that.

6              THE COURT:  Well, all these crimes that attribute you

7    participating in --

8              THE DEFENDANT:  Every crime that I participated in, I

9    take full responsibility for.

10             THE COURT:  Did you lose jobs during this period?

11             THE DEFENDANT:  Did I lose my job during this period?

12             THE COURT:  Yes.

13             THE DEFENDANT:  Yes, I have.

14             THE COURT:  How many times did you lose your job

15   during this period?

16             THE DEFENDANT:  I only lost my job once.

17             THE COURT:  Just once?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Then you had a job the other times?

20             THE DEFENDANT:  No, I didn't have a job before.

21             THE COURT:  You didn't?

22             THE DEFENDANT:  No.

23             MR. SIEGEL:  Judge, if I could clarify the timing.

24   Mr. Grant was released in, I believe, 2012.  And at that time,

25   he and his nuclear family, his wife and his children, moved

F1DSGRAS

1  down to Silver Springs.  I believe his sister was already down

2  there, correct?

3          THE DEFENDANT:  Yes.

4          MR. SIEGEL:  He worked.  He got this job working in a

5  cleaning company down there.  Then he was laid off from that

6  job, and then following that, he became involved in this

7  conspiracy that we are discussing today and committed the

8  robberies that he admitted to when he pled guilty and that are

9  described in his plea agreement.  That is basically the

10  sequence of events.

11          THE COURT:  You have these cases, and they are really

12  difficult from this standpoint, because you have to figure,

13  what has caused you to get into this?  As I understand it, you

14  lost your job and you committed these or helped plan these

15  robberies after you lost your job.

16          Now, I had a guy in front of me who used to live in

17  Newark, New Jersey.  I don't know where he is now, but he had a

18  record.  And his wife had a job and she was in the personnel

19  department of a big company.  And she had an answering machine

20  because she had to keep track of the employees and where they

21  were.  It was a big enough company.

22          The defense lawyer found out that she had used this

23  computer to handle job inquiries with people who have been laid

24  off or would apply, and it was all down there for the last two

25  years.  And he had been turned down right and left for a job

because of his record.  Part of it was he was applying in the

wrong place.  There were jobs that would never hire him because

of federal regulations, places like that.

So his record of being turned down and applying for

jobs as a truck driver and things like that, he had a complete

record of all this.  And he fell for a story, along with his

buddies, who were all there for pickup basketball, and when

they weren't doing anything and a couple of them were in

halfway houses and met a man who wanted to get some time off

his sentence by helping the government.

He approached them in the halfway house, and these

guys are coming out on 10-year sentences, and they listened to

his song and dance.  And a couple of them fell for his song and

dance, and they started to think to make up one of their own of

how they got enticed in this thing.

I took a chance on him because he had his record.

What I was trying to do was research a little bit, because

during this period of time, there was a lot of unemployment.  I

wondered really how much of that really merited a sentence, a

jail sentence, or whether the unemployment turndowns that he

had a record of, he deserved this second chance.  She convinced

me that this man was worth a chance.  He is employed now and

has been employed for about a year.

Prior to that, he went through training school ran by

a charitable organization, and so he had qualifications and

F1DSGRAS

1    graduated and some recommendation from the charitable

2    organization as to his showing up on time, passing his courses.

3    And he had a recent record of showing he could work and would

4    work.  It is very hard to get a line on a man who has been out

5    of work for 10 years.  He had been doing housework, taking care

6    of the kids while his wife supported the family, but you can't

7    tell what kind of a job he was doing because there are no

8    records of how much he takes care of the kids and whether he

9    does a good job or whether that is just a cover story, so to

10   speak.

11          If he hadn't been committing crimes the way he had in

12   his youth, you don't seem to really have a method offered

13   particularly with people with records, because they think it is

14   hopeless.  I think many of those that think it is hopeless and

15   act accordingly, so there is no real way for a judge to pick

16   and choose one defendant over another.  So I decided the thing

17   to do is, on occasion, after I saw what appeared to be a

18   possible candidate, who given the training and the job

19   opportunity, and lo and behold, this man found it.

20          I don't know that that works, because that is pretty

21   chancy.  So what I am saying is, that if you were a judge up

22   here, and there are a lot of judges and some of them try to

23   look to prove that these guys deserve a second chance.  You

24   figure your criminal record contributed to it, and the harder

25   it is to get you a job.  Somehow we have got to make those

F1DSGRAS

 1    judges' obligation to look to see whether a person is able to

 2    turn the second page in his life and turn himself around, which

 3    is what you would like to see, what you would like to do, but

 4    you have got to get some help for the defendant.

 5              Those of you who have got a better education than the

 6    others have a better chance of getting that, or even if it

 7    doesn't work out for a shorter sentence, it works out possibly

 8    for getting a job, which is the hard thing.  You have so much

 9    unemployment, and so many of them are people with records.  It

10    is very hard to know who to put your faith in.

11              I don't know that people have ever thought about it

12    that way.  The judge sentences people and has gotten its image,

13    but the judge doesn't want to have any of these guys go back to

14    prison, if they have got something to hang their hat on.  That

15    is the problem with being a judge; you don't have much

16    cooperation from the other side.  You have to have something to

17    hang your hat on.

18              That is why I asked what kind of employment you had,

19    because I was hoping you would be able to show that, as far as

20    I could see, you didn't do anything wrong and you were with

21    your job.  The trouble is you got laid off and it was pretty

22    hard to recover from, but it doesn't give me -- if you were a

23    long-term employee who had a job for six months or a year, I

24    would be willing to take a chance on you, but I don't have

25    anything to go on.

F1DSGRAS

1            There should be more employment opportunities for the
2      last five years.  Your unemployment has been very high, and
3      there are lots of people looking for jobs that haven't got a
4      record.  They have a very minor record.  I have got other
5      people who have finished a period of supervised release and who
6      now completed the job training, and they can't get a job.

7            We haven't found a solution yet.  We have some who
8      have gotten jobs who have records, gotten jobs, but I only have
9      a handful, and I have been around here a long time.  Mandatory
10     sentences are given too much, but then Booker came along and we
11     have a lot of nonmandatory opportunity, but we need trust, and
12     it involves the defendant.

13            Let me see what Mr. Montague has.  Mr. Montague
14     pointed out something.  He said he doesn't think I gave you a
15     chance to say anything.  You weren't through, so...

16            THE DEFENDANT:  Your Honor, on the job, when I lost my
17     job, I was e-mailing a whole bunch of resumes in for another
18     job, even to get back into college, because I started some
19     college courses while I was incarcerated.  I was doing
20     everything in my power to stay on the right track, looking for
21     jobs, trying to get back into school, doing everything.  Even
22     what you were just explaining, staying home with my kids while
23     my wife was at work.

24            THE COURT:  That is a problem.

25            THE DEFENDANT:  You were going to say something?

F1DSGRAS

1          THE COURT:  It is very hard, to be discouraged after

2     you got turned down after turned down after turned down the way

3     this guy did.  And he had records to show that he had applied.

4     They were on the computer.

5          THE DEFENDANT:  I am pretty sure if you look up --

6          THE COURT:  He got interviews and all, but as soon as

7     they knew -- on a lot of these jobs, they were ones that the

8     government restrictions don't allow them to hire someone who

9     has got a record.  That was one of the problems.  He didn't

10    take any training, he just played basketball while in the

11    prison yard with his pals, and they convinced him that they got

12    a good deal to make a couple million dollars --

13          THE DEFENDANT:  I have a lot of trades.

14          THE COURT:  -- robbing a stash house that never

15    existed.  So he didn't feel that he deserved a sentence, when

16    the government's employees, special agents, or special

17    cooperators dream up a crazy deal where they knock off a stash

18    house and provide the money.  I guess there wasn't any stash

19    house.  There wasn't any crack.  There wasn't anything to sell.

20    They didn't agree with this guy that they would help him knock

21    off the stash house that didn't exist.

22          How are you going to sentence someone to a long prison

23    term on a deal that didn't exist when they had just come off of

24    10 years in prison?  They are still in the halfway house and

25    you are going to sentence them again to another 10 years?  The

F1DSGRAS

```
 1   man will never be out.  I think they served their time in that

 2   case.  It was a mistake.  I don't think he deserved the

 3   sentence; some of them did.  The guy that brought the guns,

 4   brought six guns to the meeting place, he deserves to sit in

 5   jail.  He knows that's wrong.  Some of the guys just believed

 6   the other guys.

 7          THE DEFENDANT:  I just want to thank you, your Honor,

 8   and let you know that --

 9          THE COURT:  What did you say?

10          THE DEFENDANT:  I said I just wanted to thank you,

11   first and foremost, and just to say that I take responsibility

12   for everything I am being charged with.  And I just want to let

13   you know that, no matter what happens today, today is a new

14   start for me either way.  It is a new start for me.

15          THE COURT:  Well, the thing is that I don't know what

16   to do.  I never make up my mind.  I don't think you guys think

17   enough about the judge's role and what they are thinking, and

18   try to anticipate and really try to get a sentence that is fair

19   and under the circumstances and under your life circumstances.

20   What I guess I am saying is that, when you didn't have a job, I

21   don't know for how long, a year, I guess?

22          THE DEFENDANT:  Yes.

23          THE COURT:  I would say about a year, that you really

24   made an effort to get a regular job one way or another.

25          Where do you live?  Where did you live before you
```

F1DSGRAS

1   moved down to Silver Springs?

2            THE DEFENDANT:  I lived in Brooklyn.

3            THE COURT:  Brooklyn?

4            THE DEFENDANT:  Yes.

5            THE COURT:  It's hard, but there are programs.

6            THE DEFENDANT:  That was my whole reason for moving

7   down to Silver Springs, because it was hard and I couldn't find

8   a job in Brooklyn because of my record, because of the mistakes

9   I made when I was a teenager.  So as an adult, I wanted to make

10  changes, which I did.  I had a job, living in a whole different

11  state.

12           THE COURT:  Well, this guy lived in Newark and

13  couldn't get a job.

14           THE DEFENDANT:  I want to say thank you, your Honor,

15  for listening to me and giving me the time to express myself.

16           THE COURT:  What are your skills?

17           THE DEFENDANT:  I have building maintenance, plumbing,

18  electric.

19           THE COURT:  Excuse me?

20           THE DEFENDANT:  I took up electric, plumbing, and

21  building maintenance.

22           THE COURT:  I don't quite understand that, Mr. Siegel.

23  Could you tell me?

24           MR. SIEGEL:  Yes.  He said he took up building

25  maintenance, plumbing, and electricity.

F1DSGRAS

1        THE COURT:  Did you take courses in that?

2        THE DEFENDANT:  Yes, I took those courses.

3        THE COURT:  From what organization?

4        THE DEFENDANT:  This is when I was incarcerated.

5        THE COURT:  No job?

6        THE DEFENDANT:  While I was incarcerated.  Those

7   are -- they are trades, but --

8        THE COURT:  No job offers after you got out?

9        THE DEFENDANT:  No.  I kept getting, "We'll get back

10  to you."

11       THE COURT:  What kind of organizations did you try to

12  get the jobs from?

13       THE DEFENDANT:  From DeVry.

14       THE COURT:  I'm sorry, what organizations did you try

15  and get the jobs from?

16       THE DEFENDANT:  From DeVry, UTI Tech.

17       THE COURT:  I don't know them.

18       THE DEFENDANT:  Yes.  I went through those

19  organizations to get jobs, because those have the fields that I

20  am good in, those organizations; electrician, plumber, painter,

21  plasterer.

22       THE COURT:  You got a license in electrician?

23       THE DEFENDANT:  With New York State Department of

24  Corrections I do.  I have certificates for it.

25       THE COURT:  But nothing on the outside?  You couldn't

F1DSGRAS

1    go to an electrician --

2              THE DEFENDANT:  No, nothing on the outside.

3              THE COURT:  You had no one looking for a job for you?

4              THE DEFENDANT:  I was looking for the jobs.

5              THE COURT:  You were?

6              THE DEFENDANT:  Yes.

7              THE COURT:  But no one helping you?

8              THE DEFENDANT:  Yes, I had people helping me.

9              THE COURT:  Who?  What organizations helped you?

10             THE DEFENDANT:  No organization.  Family was helping

11   me.

12             THE COURT:  Please be seated.  I am sorry if I kept

13   you up.  If there is anything else you would like to say, you

14   can say it sitting down.

15             I want to talk to the government.  Is there anyone

16   here who can tell me whether the government tried in any way to

17   employ this man?  Not themselves, but organizations that tried

18   to seek jobs for him, people who lost their jobs, other than

19   the labor department?

20             MR. COOPER:  Sorry, your Honor.  I don't think I

21   follow the court's question.

22             THE COURT:  Well, I am trying to see whether, when

23   these men are released by the prison authorities, if there is

24   any organization that they are referring to or helped by to

25   find employment?

F1DSGRAS

1           MR. COOPER:  Your Honor, I think the best that I can

2      do in terms of answering the court's question is, my

3      understanding that on supervised release, probation officers

4      often work with releasees to assist in those types of

5      endeavors.  I don't have any specific information --

6           THE COURT:  That is what usually happens, but this

7      man, I don't know whether he fell through the cracks and what

8      kind of help he needed.  Because as I said, this other man

9      applied to all these places and he never even got a response

10     from the vast majority of them.  He did get a response from

11     several.  In fact, he almost got hired, until they learned he

12     had a criminal record.  They denied him because the law denied

13     him, the law that governs all these prisoners.  They're not

14     letting certain organizations hire them.  But they would waste

15     their time applying to these places, and it is very

16     discouraging.

17          MR. COOPER:  Your Honor, in terms of Mr. Grant and his

18     previous release from incarceration on the state charge, the

19     only information I have is what is contained in the presentence

20     report --

21          THE COURT:  I know.

22          MR. COOPER:  -- which appears to reflect that he was

23     paroled for his last term of incarceration in September of

24     2012, and that is at paragraph 102.

25          THE COURT:  Yes.

F1DSGRAS

1          MR. COOPER:  That same month, in paragraph 136, the

2     PSR reflects that he started employment in Maryland.

3          THE COURT:  Right.

4          MR. COOPER:  The PSR reflects that Mr. Grant reported

5     that he continued his employment up until the date he was

6     arrested in this case in January of 2014.  That is the only

7     information the government has to go on in terms of his

8     post-release employment history after his last term of

9     incarceration.

10          THE COURT:  So it doesn't inform us as to his being

11     laid off?

12          MR. COOPER:  No, your Honor.  It doesn't reflect any

13     layoff.

14          THE COURT:  Have you got anything that shows that you

15     were turned down because of your previous record?

16          MR. SIEGEL:  Judge, Mr. Grant was turned down from

17     jobs, but he doesn't have anything in writing that he can show

18     the court.

19          THE COURT:  Of the layoff?

20          MR. SIEGEL:  I don't believe we have anything, but I

21     would mention that, in her letter to the court, his wife refers

22     to him having been laid off.  And in the presentence report, I

23     believe it reflects that when she was interviewed by probation,

24     she talked about that as well.  If you give me a moment, I

25     could find that for you in the presentence report.

F1DSGRAS

1          At paragraph 119, which reflects a conversation with

2     Mr. Grant's wife, who is here in court or outside the

3     courtroom -- she is still here -- it states that Grant's wife

4     believes that the loss of his job and financial constraints

5     prompted her husband to perpetuate the offense.

6          THE COURT:  118?

7          MR. SIEGEL:  119.

8          THE COURT:  119?

9          MR. SIEGEL:  Yes, sir.

10          THE COURT:  Is there any evidence that he has been

11     using drugs?

12          MR. SIEGEL:  Drug use?  Judge, I don't think Mr. Grant

13     has a notable history of drug abuse.  It appears that when he

14     was young, he smoked some marijuana, but that is the only thing

15     that is reflected in the presentence report.  He also described

16     himself as a minimal drinker who had only gotten intoxicated

17     once.

18          Judge, I would point out that much of the information

19     that Mr. Grant provided to you in response to your questions is

20     also reflected in the presentence report, which at paragraph

21     130 talks about how he got his GED.

22          THE COURT:  I did see that.

23          MR. SIEGEL:  In 2011.

24          THE COURT:  There are troubles with GEDs.  People tend

25     to regard them as the equivalent of a high school graduation,

but they're not.  The trouble with the GED is that it does

reflect your individual ability to study and what have you, but

it doesn't teach you how to work with other people.  It doesn't

help with anger management.  People who have anger

management -- because that is one of the things that isn't

tested for by probation, as far as I can see, and it is

something that is very difficult for employers to ascertain,

that the applicant suffers from any of these things.

They should take anger management as a course, because

all the jobs require you to cooperate with other people, if not

normally your boss and if your boss thinks you have an

attitude, then they're not going to hire you.  I am using slang

saying "attitude," but what I mean by that is, I am my own man.

And in certain sections of town, being your own man is being

your own man as a signal of you don't want to take orders from

anybody, but that is required and is really necessary in order

to hold a job.

Sometimes there is an attitude towards a female

supervisor.  You don't want to have anything told to you by a

woman to do anything.  These days, you have got to get used to

that being the case when I grew up.  They didn't have women

supervisors.  Nowadays, they're all over the place.  You have

got to be able to cooperate with them.  A lot of people haven't

been taught to have a proper attitude towards a woman

supervisor.  You have got to adjust yourself.

F1DSGRAS

1            There is nothing in here about problems of that sort.

2    There is nothing in here, so I would just like to take a week

3    and ask probation to look into these allegations.  One of your

4    answers says that his wife thinks that certain things

5    contributed to his chain of events.  At the same time, I don't

6    know if she knows.  I don't think he discussed his early life

7    with his wife, from reading the transcript.  Maybe you can find

8    it.  It is that she believes that.

9            MR. SIEGEL:  I do think she was present.  He was with

10    her at the time that he was working, and then she is aware that

11    he lost his job.

12            THE COURT:  Yes, but the earlier record and how that

13    affects his job-hunting.

14            MR. SIEGEL:  I also would note that there were a

15    couple of letters attached to the sentencing memorandum from

16    people who know Mr. Grant.  One of them is a woman who is a

17    program coordinator for the Queens Library Youth Literacy

18    Program serving disconnected youth.  She has seen him help with

19    the youth within the community by organizing and coaching

20    sporting events throughout the year, specifically for Key to

21    Life Academy organization.

22            THE COURT:  I saw that.

23            MR. SIEGEL:  So this is consistent with my interaction

24    with him, that he does also -- as I said in my sentencing

25    memorandum, he is not defined solely by the crimes he has

F1DSGRAS

 1    committed, but he does have these other aspects to his

 2    personality and to his makeup as a human being.

 3            THE COURT:  She is a long-time probation officer,

 4    Stephanie Dunne.  The supervisor has been around a long time

 5    too, Allyson Felix.  I think I would like to talk to the

 6    probation officers before I go on, if we can put this off a

 7    week.

 8            THE DEPUTY CLERK:  How about the 20th at 2:00?

 9            MR. SIEGEL:  That would be fine.

10            MR. COOPER:  I'm sorry.  Could we do 2:30, if that is

11    possible?

12            THE COURT:  Sure.

13            MR. COOPER:  Thank you.

14            MR. SIEGEL:  Thank you, Judge.

15            MR. COOPER:  Take care.

16            MR. SIEGEL:  We will see you next week.

17            THE COURT:  Thank you.

18                               o0o

19

20

21

22

23

24

25